SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone: (973) 639-9100
Facsimile: (973) 679-8656
cseeger@seegerweiss.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CLEVELAND BAKERS AND TEAMSTERS PENSION FUND, on Behalf of Itself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> KORNIT DIGITAL LTD., RONEN SAMUEL, ALON ROZNER, YUVAL COHEN, GABI SELIGSOHN, OFER BEN-ZUR, LAURI HANOVER, STEPHEN NIGRO, ALON LUMBROSO, DOV OFER, YEHOSHUA NIR, CITIGROUP GLOBAL MARKETS INC., BARCLAYS CAPITAL INC., GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, AMAZON.COM NV INVESTMENT HOLDINGS LLC, and AMAZON.COM, INC., <br><br> Defendants. | No. <br><br> CLASS ACTION <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

Plaintiff Cleveland Bakers and Teamsters Pension Fund ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Kornit Digital Ltd. ("Kornit Digital" or the "Company") press releases, U.S. Securities and Exchange Commission ("SEC") filings, analyst reports, media reports, and other publicly disclosed reports and information about defendants. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons who purchased shares of Kornit Digital common stock between August 10, 2021 and July 5, 2022, both dates inclusive (the "Class Period"), including purchases directly in Kornit Digital's November 19, 2021 public stock offering (the "Offering"), seeking to pursue remedies under the Securities Act of 1933 (the "1933 Act") and under the Securities Exchange Act of 1934 (the "1934 Act").  Defendants include Kornit Digital, several of the Company's senior officers and directors, and the investment

banking firms that served as underwriters in the Offering, as well as selling shareholders in the Offering.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§11, 12(a)(2), and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o, §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §27 of the 1934 Act, 15 U.S.C. §78aa, and §22 of the 1933 Act, 15 U.S.C. §77v.

3.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b), and §27 of the 1934 Act, because Kornit Digital is headquartered in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

4.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff Cleveland Bakers and Teamsters Pension Fund, as set forth in the certification attached hereto and incorporated by reference herein, purchased

Kornit Digital common stock during the Class Period, including shares purchased directly in the Offering, and suffered damages as a result.

6.     Defendant Kornit Digital develops, designs, and markets digital fashion and textile production technologies, with a focus on digital printing and cloud-based software for the global printed textile industry.  The Company is incorporated and headquartered in Israel with U.S. headquarters in Englewood, New Jersey.  Kornit Digital ordinary shares trade on the NASDAQ under ticker symbol "KRNT."

7.     Defendant Ronen Samuel ("Samuel") has served, at all relevant times, as Chief Executive Officer ("CEO") and a director of Kornit Digital.

8.     Defendant Alon Rozner ("Rozner") served as Chief Financial Officer ("CFO") of Kornit Digital during the Class Period, soon after which he abruptly left the Company for purported "personal reasons."

9.     Defendant Yuval Cohen served as the chairman of Kornit Digital's Board of Directors at the time of the Offering.

10.     Defendant Gabi Seligsohn served as a Kornit Digital director at the time of the Offering.

11.     Defendant Ofer Ben-Zur was a co-founder of Kornit Digital and served as a Kornit Digital director at the time of the Offering.  He was CEO of the Company from 2002 until 2014.

12.     Defendant Lauri Hanover served as a Kornit Digital director at the time of the Offering.  She later became the Company's CFO after the abrupt resignation of defendant Rozner in November 2022.

13.     Defendant Stephen Nigro served as a Kornit Digital director at the time of the Offering.

14.     Defendant Alon Lumbroso served as a Kornit Digital director at the time of the Offering.

15.     Defendant Dov Ofer served as a Kornit Digital director at the time of the Offering.

16.     Defendant Yehoshua Nir served as a Kornit Digital director at the time of the Offering.

17.     Defendants Samuel and Rozner are referred to herein as the "Officer Defendants."

18.     The defendants referenced above in ¶¶7-17, are collectively referred to herein as the "Individual Defendants."  Each of the Individual Defendants, other than defendant Rozner, signed or authorized the signing of the Registration Statement used to conduct the Offering.

19.     Defendants Citigroup Global Markets Inc., Barclays Capital Inc., Goldman Sachs & Co. LLC, and Morgan Stanley & Co. LLC are referred to herein as the "Underwriter Defendants."   The Underwriter Defendants served as

underwriters and lead underwriter representatives for the Offering.  Pursuant to the 1933 Act, the Underwriter Defendants are liable for the materially false and misleading statements in the Registration Statement (defined herein) as follows:

(a)     The Underwriter Defendants are investment banking houses that specialize in, *inter alia*, underwriting public offerings of securities.  They served as the underwriters of the Offering and shared over $15 million in fees collectively for their services.  The Underwriter Defendants determined that in return for their share of the Offering proceeds, they were willing to solicit purchases of Kornit Digital shares in the Offering.  Each of the Underwriter Defendants designated personnel to the Offering working group, including investment bankers, analysts, associates, and counsel, to market Kornit Digital shares, and those personnel worked on and approved the content of Kornit Digital's Registration Statement and other offering materials.

(b)     The Underwriter Defendants demanded and obtained an agreement from Kornit Digital that Kornit Digital would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.  They also made certain that Kornit Digital had purchased millions of dollars in directors' and officers' liability insurance.

(c)     Representatives of the Underwriter Defendants also assisted Kornit Digital and the Individual Defendants in planning the Offering and

purportedly conducted an adequate and reasonable investigation into the business and operations of Kornit Digital, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the Offering. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Kornit Digital's operations and financial prospects.

(d)     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Kornit Digital's management, top executives, and outside counsel and engaged in "drafting sessions" in advance of the Offering. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price range at which Kornit Digital shares would be sold; (iii) the language to be used in the Registration Statement; and (iv) what disclosures about Kornit Digital would be made in the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Kornit Digital's management and top executives, such as the Individual Defendants, the Underwriter Defendants knew, or should have known, of Kornit Digital's existing problems as detailed herein.

(e)    The Underwriter Defendants solicited and sold in the Offering Kornit Digital shares to plaintiff and other members of the Class.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

20.    Defendant Amazon.com NV Investment Holdings LLC ("Amazon Holdings") is a wholly owned subsidiary of Amazon.com.  Amazon Holdings sold over 700,000 shares of Kornit Digital stock in the Offering.

21.    Defendant Amazon.com, Inc. ("Amazon") is the parent of Amazon Holdings, as well as one of Kornit Digital's most important business partners and a key shareholder of the Company.  For example, in 2021, Amazon accounted for 27% of Kornit Digital's total revenue.

## CLASS ACTION ALLEGATIONS

22.    Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased Kornit Digital common stock during the Class Period (the "Class"), including shares purchased directly in the Offering. Excluded from the Class are defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

23.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Kornit Digital common stock was actively traded on the NASDAQ.   While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Kornit Digital or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

24.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

25.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

26.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)     whether defendants' statements during the Class Period were materially false and misleading;

(b)     whether defendants violated the 1933 Act

(c)     whether defendants violated the 1934 Act; and

(d)     the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

27.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## BACKGROUND

28.     Based in Israel, with U.S. headquarters in Englewood, New Jersey, Kornit Digital develops, designs, and markets digital fashion and textile production technologies, with a focus on digital printing and cloud-based software for the global printed textile industry.  The Company specializes in the fashion, apparel, and home décor segments of the direct-to-garment ("DTG") and direct-to-fabric ("DTF") printed and decorated textile industry.  DTG involves the printing of images and designs directly onto finished textiles, such as t-shirts that have already been sewn

and dyed.  DTF involves printing images and designs onto rolling fabric.  Kornit Digital's offerings include its proprietary digital printing systems, ink and other consumables, and associated software and value-added services that allow for large-scale printing of complex images and designs directly onto finished garments and fabrics.

29.    Kornit Digital has claimed that the digitization of manufacturing is transforming the way products and garments are being produced.  According to Kornit Digital, its technologies allow for the manufacture of a high volume of product options and unique designs, without sacrificing cost, delivery, and quality.  Kornit Digital also claims to be able to mass produce in smaller batches, which provides manufacturers with the flexibility to reduce finished goods inventory risks by identifying consumer buying patterns and responding to demand in a more timely fashion.

30.    On February 16, 2021, Kornit Digital issued a release highlighting the Company's financial results for its fourth fiscal quarter and full year 2020.  The release stated that for the year ended December 31, 2020, Kornit Digital generated revenue of $193.3 million, representing an increase of 7.5% over the prior fiscal year.  Further, the release represented that the Company had achieved "'[r]ecord growth in recurring consumables business.'"  The release also maintained that the Company was entering 2021 with "'strong visibility'" and demand from global

customers, claiming that a "'significant order backlog and solid pipeline'" had positioned the Company "'well to drive sizeable growth and profitability in 2021 and beyond.'"

31.    Similarly, on May 11, 2021, Kornit Digital issued a release highlighting the Company's financial results for its first fiscal quarter of 2021. The release stated that the Company had achieved $66.1 million in quarterly revenue, a 152% year-over-year increase. In the release, defendant Samuel praised the "'strong start to the year'" and claimed the "'outlook for the year is very strong.'"

32.    Throughout the Class Period, defendants continued to claim that Kornit Digital was experiencing favorable financial and operating trends, repeatedly highlighting Kornit Digital's revenue, customer base, pipeline, and visibility.

33.    However, unbeknownst to investors, these assurances were materially false and misleading when made. By the start of the Class Period, among other adverse facts, Kornit Digital was in the process of losing substantial business from two of its biggest customers: (i) DTG2Go, a subsidiary of Delta Apparel; and (ii) Fanatics. Furthermore, the loss of these two customers would adversely affect Kornit Digital financial results, which were also being impacted by an unfavorable change in the Company's sales mix and lower demand trends. Rather than disclose these adverse facts to investors, defendants created the misleading impression that

Kornit Digital was continuing to experience an exceptional demand and sales environment throughout the Class Period.

34.     Defendants' failure to disclose these adverse facts caused the price of Kornit Digital stock to trade at artificially inflated prices, reaching a high of over $181 per share during the Class Period.  With the price of Kornit Digital stock artificially inflated, defendants conducted a $450 million follow-on offering of Kornit Digital stock in November 2021.  In addition, Kornit Digital insiders collectively sold nearly $12 million worth of their own Kornit Digital shares during the Class Period at fraud-inflated prices, including $9.4 million worth of shares sold by defendant Samuel alone.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED IN THE REGISTRATION STATEMENT

35.     On November 19, 2021, Kornit Digital filed with the SEC a prospectus supplement on Form 424B5 (the "Prospectus"), which incorporated and formed part of a shelf registration statement previously filed with the SEC on Form F-3ASR (the "Registration Statement").  Pursuant to the Registration Statement, Kornit Digital and defendant Amazon Holdings, a favored shareholder of the Company and a subsidiary of defendant Amazon (one of Kornit Digital's most important clients), collectively sold approximately 3 million Kornit Digital shares to public investors at $151 per share, for more than $450 million in gross offering proceeds.

36.    The Registration Statement stated that in the nine months ended September 30, 2021, Kornit Digital generated revenue of $234.5 million, representing an increase of 93.7% over the nine months ended September 30, 2020.

37.    The Registration Statement further asserted that the Company's "current market opportunity is 21 billion impressions . . . with the potential to reach an estimated 31 billion impressions by the end of 2026, and 39 billion square meters of printed fabric output industry-wide . . . with the potential to reach an estimated 42 billion by the end of 2026."

38.    Defendants' statements referenced in ¶¶36-37 above were materially false and misleading when made because they misrepresented and failed to disclose the following material adverse facts about Kornit Digital's business, operations, and prospects, which existed at the time of the Offering:

(a)    that one of Kornit Digital's largest customers, DTG2Go, a Delta Apparel subsidiary, was transitioning to a competitor's product offerings for its manufacturing needs;

(b)    that a second key customer, Fanatics, had decided to outsource production, a substantial portion of which was going to producers using non-Kornit Digital systems;

(c)    that, as a result of (a)-(b) above, Kornit Digital expected to and ultimately did lose substantial demand for its products and services;

(d)   that Kornit Digital was suffering from lessening demand for high-margin consumables, which caused the Company to suffer from an unfavorable sales mix and lower gross margins;

(e)   that e-commerce demand for Kornit Digital products was slowing down as facets of the economy reopened following the COVID-19 pandemic, which was having a negative effect on Company revenue;

(f)   that Kornit Digital had artificially boosted sales during the pandemic by selling more inventory than was needed to its customers, which caused a customer inventory glut which pulled sales forward and had contributed to slowing demand; and

(g)   that as a result of (a)-(f) above, Kornit Digital's projected financial results and market opportunity were not achievable and lacked a reasonable basis in fact.

39.   Subsequent to the Offering, the price of the Kornit Digital stock sold therein fell substantially below the Offering price, falling to a low of just $20.40 per share on July 6, 2022.  As of the date of this complaint, the price of the Kornit Digital stock sold in the Offering has remained substantially below the Offering price, inflicting economic losses and damages on investors in the Offering.

## COUNT I

### For Violation of §11 of the 1933 Act
### Against All Defendants Except Defendants Rozner, Amazon,
### and Amazon Holdings

40.     Plaintiff incorporates ¶¶1-39 by reference.

41.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except defendants Rozner, Amazon, and Amazon Holdings.

42.     This Count does not sound in fraud.  For purposes of the 1933 Act claims alleged herein, plaintiff does not allege that any of the defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

43.     The Registration Statement for the Offering was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

44.     The defendants named herein were responsible for the contents and dissemination of the Registration Statement as signatories and/or directors of the Company or as the underwriters of the Offering.

45.     Kornit Digital is the registrant for the Offering.  As the issuer of the shares, Kornit Digital is strictly liable to plaintiff and the Class for the misstatements and omissions.

46.     The Individual Defendants named herein each signed the Registration Statement and/or were named as Kornit Digital directors in the Registration Statement.

47.     The Underwriter Defendants served as underwriters for the Offering.

48.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

49.     By reason of the conduct alleged herein, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

50.     Plaintiff purchased Kornit Digital shares registered pursuant to the Registration Statement and traceable to the Offering.

51.     Plaintiff and the Class have sustained damages.  The value of the Kornit Digital shares sold in the Offering has declined substantially subsequent to and due to defendants' violations.

52.     At the time of their purchases of Kornit Digital shares, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint.  Less than three

years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

## COUNT II

### For Violation of §12(a)(2) of the 1933 Act
### Against All Defendants

53.    Plaintiff incorporates ¶¶1-52 by reference.

54.    This Count is brought pursuant to §12(a)(2) of the 1933 Act, 15 U.S.C. §77l(a)(2), on behalf of the Class against all defendants.

55.    This Count does not sound in fraud.  For purposes of the 1933 Act claims alleged herein, plaintiff does not allege that any of the defendants had scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

56.    The defendants named herein were the sellers and offerors and/or solicitors of purchasers of the Kornit Digital shares offered pursuant to the Prospectus.  Defendants each solicited and/or sold shares in the Offering for their own financial benefit or the benefit of Kornit Digital and/or Amazon.

57.    As set forth above, the Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.  Defendants' actions of solicitation included preparing the inaccurate and misleading Prospectus and participating in efforts to market the Offering to investors.

58.     Defendants named herein owed to the purchasers of Kornit Digital shares in the Offering, including plaintiff and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact.  Defendants named herein, in the exercise of reasonable care, should have known that the Prospectus contained misstatements and omissions of material fact.

59.     Plaintiff and the other members of the Class purchased or otherwise acquired Kornit Digital shares pursuant to the Prospectus, and neither plaintiff nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies, and omissions contained in the Prospectus.

60.     Plaintiff, individually and on behalf of the Class, hereby offers to tender to defendants those Kornit Digital shares that plaintiff and the other Class members continue to own, in return for the consideration paid for those shares together with interest thereon.  Class members who have sold their shares are entitled to rescissory damages.

## COUNT III

**For Violation of §15 of the 1933 Act**
**Against Kornit Digital, the Individual Defendants, and Amazon**

61.     Plaintiff incorporates ¶¶1-60 by reference.

62.     This Count is brought pursuant to §15 of the 1933 Act, 15 U.S.C. §77o, against Kornit Digital, the Individual Defendants, and defendant Amazon.

63.     The Individual Defendants were each control persons of Kornit Digital at the time of the Offering by virtue of their positions as shareholders, directors, and/or senior officers of Kornit Digital.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Kornit Digital.

64.     Kornit Digital controlled the Individual Defendants and all of Kornit Digital's employees.

65.     Defendant Amazon controlled defendant Amazon Holdings, its wholly owned subsidiary.

66.     Defendant Kornit Digital, the Individual Defendants, and defendant Amazon each were culpable participants in the violations of §§11 and 12(a)(2) of the 1933 Act alleged in the Counts above, based on their having signed or authorized the signing of the Registration Statement and having otherwise marketed and participated in the process which allowed the Offering to be successfully completed.

### ADDITIONAL 1934 ACT ALLEGATIONS

67.     Plaintiff incorporates ¶¶1-39 by reference.

## ADDITIONAL MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

68.    The Class Period begins on August 10, 2021.  On that date, Kornit Digital issued a release which announced the Company's financial results for its second fiscal quarter of 2021 (the "2Q21 release").  The 2Q21 release stated that Kornit Digital had generated $81.7 million in quarterly revenue and non-GAAP gross margins of 48.2%.  The release also stated that Kornit Digital's "'[v]isibility, pipeline and confidence for the remainder of [the] year and into next year have never been stronger.'"

69.    In the 2Q21 release, defendant Samuel stated that the "'Company executed across the board, delivering on massive global expansion projects with top strategic customers and driving growth from new customers, both in the DTG and DTF product lines.'"  Defendant Samuel also talked about the strength of the Company's visibility and outlook, stating in pertinent part as follows:

> "***Our pipeline and visibility have never been stronger as the industry accelerates its digital transformation with Kornit leading the way.  We are more confident than ever in our outlook for the remainder of this year and into next year, and believe we are well on our way to becoming the operating system for on demand sustainable fashion and a $1 billion revenue company in 2026***."

70.    That same day, Kornit Digital held an earnings call with analysts and investors to discuss the Company's second quarter 2021 results, hosted by defendants Samuel and Rozner.  In his prepared remarks, defendant Samuel

characterized the results as "truly amazing" and stated: "[W]e significantly beat expectations, saw tremendous top and bottom line growth, posted a very strong gross margin and ended the quarter with an extremely strong backlog and pipeline." Defendant Samuel added: "We again saw very strong growth with key customers as well as with net new customers, and our pipeline has never been stronger."

71.    Later in the call, defendant Rozner stated in his prepared remarks that "[o]ur second quarter results were again driven by strong orders for DTG systems in addition to increased demand for consumables and services." Defendant Rozner continued: "This significant growth was due in part to continued momentum with strategic accounts, which we expect to continue into the second half of the year." Similarly, in response to an analyst's question, defendant Rozner claimed that "we see good impact . . . by the acceleration of the e-commerce and the development of our business," adding that "the momentum is very positive for our business."

72.    On November 10, 2021, Kornit Digital issued a release which announced the Company's financial results for its third fiscal quarter of 2021 (the "3Q21 release"). The 3Q21 release stated that Kornit Digital had generated $86.7 million in quarterly revenue and non-GAAP gross margins of 47.8%. The release also stated that the Company "[e]nters 2022 with extremely strong business fundamentals, momentum, and pipeline."

73.     In the 3Q21 release, defendant Samuel stated: "'We are witnessing the change in the fashion industry with an acceleration to sustainable, on-demand production. . . .   Kornit is leading the digital transformation the fashion industry must make . . . .'"   Defendant Samuel continued: "'We enter 2022 with very strong business fundamentals supported by broad-based demand for our industry leading solutions.  This growing demand and market acceptance puts us firmly on the path of becoming a $1 billion revenue company in 2026.'"

74.     Similarly, in the 3Q21 release defendant Rozner claimed: "'We enter 2022 in a phenomenal position with outstanding business fundamentals, a robust backlog and strong pipeline.'"

75.     That same day, Kornit Digital held an earnings call with analysts and investors to discuss the Company's third quarter 2021 results, hosted by defendants Samuel and Rozner.  In his prepared remarks, defendant Samuel stated: "It was a phenomenal quarter with record revenue across all regions, strong profitability and operating cash flows."  Defendant Samuel further represented: "We are also making progress with other strategic accounts, including well-known fashion and e-commerce companies."  In addition, defendant Samuel stated that "[l]ooking ahead into 2022, the NPI [New Product Introduction] pipeline is unprecedented," and based on the Company's "strong momentum" Kornit Digital was "gearing up to what we expect to be an amazing 2022."

76.    Likewise, defendant Rozner stated in his opening remarks that "we made great progress with new customers while continuing our very strong momentum with large strategic customers, which we expect to continue for the balance of 2021 and throughout 2022."

77.    On February 15, 2022, Kornit Digital issued a release which announced the Company's financial results for its fourth fiscal quarter and full year of 2021 (the "FY21 release").  The FY21 release stated that Kornit Digital had generated $322 million in annual revenue and $87.5 million in fourth quarter revenue.  In regard to gross margins, the release stated that Kornit Digital's non-GAAP gross margin in the fourth quarter was 49.6% and non-GAAP gross margin for the full year was 48.2%.  The release emphasized that the Company was "[e]ntering 2022 with very strong backlog and visibility."

78.    In the FY21 release, defendant Samuel claimed that the Company had "'never been in a better position,'" stating in pertinent part as follows:

> "We enter 2022 for what will be one of the busiest and most exciting years in the history of Kornit; a year with strong growth and a remarkable pipeline of ground-breaking new product introductions, starting already in the first quarter.  ***We have never been in a better position as a company and we are extremely confident in our ability to meet our $1B revenue goal by 2026, if not before***."

79.    Also in the release, defendant Rozner emphasized that the Company purportedly continued to "'accelerate growth,'" stating in pertinent part as follows:

- 23 -

"We ended 2021 with an outstanding fourth quarter and entered 2022 with a strong backlog and pipeline . . . .  We generated record cash flow from operations in 2021, successfully navigated global supply chain pressures, and delivered on our commitments to our customers. ***We continue to invest in the business to capitalize on the enormous opportunities we see and to accelerate growth.  Our good visibility into the business, combined with our experienced team, gives us the confidence that we can deliver on our commitments for the balance of 2022 and into 2023***."

80.     The FY21 release also provided guidance for the first quarter of 2022.  The release stated: "For the first quarter of 2022, the Company expects revenue to be in the range of $87 million to $91 million, and non-GAAP operating income to be in the range of 7% to 9% of revenue, and EBITDA Margins to be in the range of 9% to 11%."

81.     That same day, Kornit Digital held an earnings call with analysts and investors to discuss the Company's fourth quarter and fiscal year 2021 results, hosted by defendants Samuel and Rozner.  In his prepared remarks, defendant Samuel stated: "We delivered remarkable year-over-year total revenue growth of over 65% and shipped a large number of mass production systems that will continue to fuel the growth of our recurring revenue streams for years to come."  Defendant Samuel continued: "Our record recurring consumables and services revenues were driven by an exceptional peak season."

82.     Defendant Samuel further represented that these strong demand trends were continuing.  For example, he stated: "We ended the quarter with a very strong

backlog of orders and an extremely robust pipeline across all regions, giving us tremendous tailwind into 2022." Defendant Rozner added: "As we enter 2022, we are gearing up for a very busy upgrade cycle in addition to a number of innovative NPIs and have very strong backlog heading into the first and second quarter." Defendant Samuel additionally stated that Kornit Digital was experiencing "outstanding momentum" and that "[g]rowth activities with our global strategic account, particularly this quarter in Americas continue to be tremendous and we expect these impressive volumes of activities to continue in 2022 and beyond as our relationship continues to be stronger than ever."

83.     During his prepared remarks, defendant Rozner likewise claimed that Kornit Digital "ended an outstanding 2021 and entered 2022 with a strong backlog and robust pipeline which gives us excellent visibility into 2022 and beyond." Defendant Rozner added: "Entering 2022, we have never been in a better position as a company, and we will continue to build and expand on our strong foundations with new product introductions, targeted investments in the business, strategic acquisitions and partnerships within the 3 key pillars of our strategy." Defendant Rozner further stated: "We expect gross margins to improve longer term given the ongoing shift to higher mix of mass production systems, profitability leverage in growing our recurring consumable business, continued operational efficiencies and margin improvement in our services business."

84.     During the question-and-answer portion of the call, defendant Samuel

maintained that as facets of the economy re-opened post-COVID-19, Kornit Digital

would "see major demand going into the e-commerce into the different platform of

the marketplaces."  He added that, while the fourth quarter "was one of the strongest

peak season[s] ever," the quarter represented "just the beginning" of accelerating

demand trends as people begin to refocus on fashion after lockdown.

85.     On March 30, 2022, Kornit Digital filed with the SEC the Company's

financial results for the fiscal year 2021 ended December 31, 2021 on Form 20-F,

which was signed by the Individual Defendants.  The Form 20-F contained the

financial information regarding Kornit Digital's fiscal year 2021 financial results

contained in the FY21 release and related earnings call.

86.     Defendants' statements referenced in ¶¶68-85 above were materially

false and misleading when made because they misrepresented and failed to disclose

material adverse facts about Kornit Digital's business, operations, and prospects,

which were known to defendants or recklessly disregarded by them, as follows:

(a)     that one of Kornit Digital's largest customers, DTG2Go, a Delta

Apparel subsidiary, was transitioning to a competitor's product offerings for its

manufacturing needs;

(b)    that a second key customer, Fanatics, had decided to outsource production, a substantial portion of which was going to producers using non-Kornit Digital systems;

(c)    that, as a result of (a)-(b) above, Kornit Digital expected to and ultimately did lose substantial demand for its products and services;

(d)    that Kornit Digital was suffering from lessening demand for high-margin consumables, which caused the Company to suffer from an unfavorable sales mix and lower gross margins;

(e)    that e-commerce demand for Kornit Digital products was slowing down as facets of the economy reopened following the COVID-19 pandemic, which was having a negative effect on Company revenue;

(f)    that Kornit Digital had artificially boosted sales during the pandemic by selling more inventory than was needed to its customers, which had led to a customer inventory glut which pulled sales forward and had contributed to slowing demand; and

(g)    that as a result of (a)-(f) above, Kornit Digital's projected 2022 financial results were not achievable and lacked a reasonable basis in fact.

87.    Furthermore, Kornit Digital's SEC filings during the Class Period were required to disclose the information required by Form 20-F.  In turn, Item 5 of Part I of Form 20-F ("Item 5"), entitled "Operating and Financial Review and Prospects,"

requires an issuer to disclose "***management's assessment of factors and trends which are anticipated to have a material effect on the company's financial condition and results of operations in future periods***." Specifically, Item 5(D), entitled "Trend information," provides:

> The company must identify material recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the latest financial year. ***The company also must discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition***.

88.    Similarly, Kornit Digital's SEC filings during the Class Period were required to disclose the information required by Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), which requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

89.    The failure of Kornit Digital's SEC filings to disclose that the Company was losing business from two of its most important customers and suffering from adverse demand, sales mix, and gross margin trends, violated Item 5, because these undisclosed facts were known to defendants and would (and did) have an unfavorable impact on Kornit Digital's sales, revenues, and income from continuing

operations.  This failure also violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in Kornit Digital shares speculative or risky.  Indeed, the boilerplate discussions of potential risks provided by defendants during the Class Period were themselves materially misleading because they discussed potential future contingencies regarding how a significant portion of sales is concentrated among a small number of customers, and Kornit Digital's business "*would*" be adversely affected by a decline in sales to, or the loss of, these customers, but failed to disclose that the Company's sales were *already* being affected by the loss of two major customers which was already having an adverse effect on Kornit Digital's financial performance and prospects.

90.    Then, on May 11, 2022, Kornit Digital issued a release announcing the Company's financial results and outlook for its first fiscal quarter ended March 31, 2022 (the "1Q22 release").  The 1Q22 release stated that Kornit Digital had achieved first quarter revenue of only $83.3 million, substantially lower than the $87 million to $91 million first quarter revenue range previously provided to investors.  The release also revealed Kornit Digital's plummeting non-GAAP gross margins of 41.5% for the first quarter of 2022, compared to non-GAAP gross margins of 47.1% for the same period the year prior.  Further, the 1Q22 release provided a disappointing financial outlook for Kornit Digital's second quarter of 2022, stating

that the Company expected revenue to be in the range of $85 million to $95 million, its adjusted operating margin to be in the range of negative 2% to positive 2%, and its adjusted EBITDA margin to be in the range of 0% to 4%.

91.     That same day, Kornit Digital held an earnings call with analysts and investors to discuss Kornit Digital's first quarter 2022 results and outlook for the remainder of the year, hosted by defendants Samuel and Rozner.  During the call, defendant Samuel admitted that Kornit Digital had been suffering from slower e-commerce demand trends during the Class Period, stating that the Company experienced "during Q1 and now during Q2, a slower growth on the e-commerce, which impact their business."  Also during the call, defendant Samuel revealed that one of Kornit Digital's key customers, Fanatics, had decided to "change their business model" whereby instead of printing their own products, they would "outsource their production."  Defendant Samuel further admitted that Kornit Digital had been "foreseeing" this change for some time, despite the fact that defendants had never previously disclosed it to investors.  Additionally, defendant Samuel revealed that one of Kornit Digital's "largest customers," Delta Apparel, had begun transitioning away from Kornit Digital products to those of a competitor.  Although defendant Samuel admitted that the Company had known about this development for "the last 2 quarters," it likewise had not been previously revealed to investors.

92.    As a result of this news, the price of Kornit Digital common stock plummeted from $56.41 per share when the market closed on May 10, 2022 to $37.63 per share when the market closed on May 11, 2022, a 33% decline on abnormally heavy volume of over 5 million shares traded.

93.    On May 12, 2022, an article published by *Seeking Alpha* lambasted Kornit Digital's "shock[ing]" revelation of a weaker-than-expected near-term outlook.  The article stated that "Kornit pointed to muted demand from e-commerce customers as the main reason behind the slowdown," as well as management's admission "to increasing competitive threats with two of the company's larger customers having partially shifted to non-Kornit technology."  Further, the article reported that "gross margins took a major hit due to an unfavorable mix of higher systems and lower consumable sales."

94.    However, defendants failed to disclose the whole truth to investors and continued to make materially false and misleading statements regarding Kornit Digital's business and prospects.  For example, during the earnings call defendant Samuel characterized the slowdown in demand as a "very short-term bump on the road."  Defendants also asserted that the Company's results would significantly improve in the second half of this year.  For example, defendant Samuel stated in pertinent part as follows:

> [W]e see Q2 kind of a bump on the road.  We believe in the $500 million run rate earlier than expected than Q4 2023.  We believe in the

long-term vision of the $1 billion in 2026 or before. **All the fundamentals of the business are growing and accelerating**. We see the offshore moving also. We see the consumer trends to have unique clause. We see overall e-commerce is growing. It's just slowing down versus last year where it was growing very, very fast. So all the major trends that we were talking and definitely the sustainability and short trans printing, short-term production is a major driver to our growth.

And you were asking why we believe in H2 that it will be stronger, **it will be much stronger than H1 and will be much more profitable, as Alon mentioned, in H1. First of all, we have a line of sight to major orders**. Some of them is from our global strategic account. **So you will continue seeing from the global strategic account revenue coming not only in Q2, but in Q3 and Q4 and definitely also in 2023**. We have major product introduction during Q2, which is the Atlas Poly and the Presto MAX that we already got orders and the implementation will be doing H2. **So we have very high visibility on orders**. And remember that H2 always is much stronger in terms of in consumption. Q4 is always peak season. **So you will see a much stronger H2 versus H1**.

95.   When asked by an analyst about his confidence in the second half of

2022, defendant Samuel responded in pertinent part as follows:

The confidence that come for H2 is not based on those customers. The confidence that come for H2 is based, first of all, we have recurring revenue. Almost 50% of our revenue is recurring and its H2 is higher than H1. This is the basic of our tendency of the business.

On top of that, we have a few strategic customers, including our global strategic customers that we have already the orders and commitments, and we are producing the systems. And so we don't see any risk on those. We see a growing pipeline on the new product introduction, mainly on the Presto MAX that we are now producing them, and many of them will be shipped only in Q3 and Q4. The same thing on the Atlas Poly, which we are going to release it only by the end of this quarter, Q2 and the main impact will be into H2 revenue.

Also, we start to see revenue coming from KornitX, mainly into H2. **So all in all, our confidence level into H2 that it will be much**

*stronger, both in topline and operating profit and also gross margin will be looked totally different, very similar to the gross margin we saw H2 last year is very high.*

96.     Defendants' statements referenced in ¶¶94-95 above were materially false and misleading when made because they misrepresented and failed to disclose the adverse facts about Kornit Digital's business, operations, and prospects, which were known to defendants or recklessly disregarded by them, as follows:

(a)     that the adverse trends regarding Kornit Digital's revenue and earnings were not improving or short term as represented, but in fact substantially worsening;

(b)     that the Company's problems related to its customer inventory glut and slowdown in e-commerce demand and unfavorable sales mix had persisted and were expected to continue to persist, causing the Company to suffer further deterioration in its financial results and prospects; and

(c)     that as a result of (a)-(b) above, Kornit Digital's projected 2022 financial results were not achievable and lacked a reasonable basis in fact.

97.     Then, on July 5, 2022, Kornit Digital issued a release announcing the Company's preliminary financial results and outlook for the second quarter ended June 30, 2022.  The release slashed the Company's expected second quarter revenue outlook from its original $85 million to $95 million range, to just $56.4 million to $59.4 million – *a 35% decrease*.  The release also revealed that Kornit Digital's

adjusted operating margin was expected to fall to ***negative 28% to 34%***, from the prior range of negative 2% to positive 2%, and the Company's adjusted EBITDA margin was expected to slip to ***negative 24% to negative 30%***, from the prior range of 0% to 4%.  In the release, defendant Samuel blamed the slowdown on the "'overall re-calibration of e-commerce growth, combined with macro headwinds.'"  Defendant Samuels also admitted that Kornit Digital customers were "'working through excess capacity built throughout the two-year pandemic period.'"

98.    As a result of this news, the price of Kornit Digital common stock dropped precipitously from $31.56 per share when the market closed on July 5, 2022 to $23.46 per share when the market closed on July 6, 2022, a nearly 26% decline on abnormally heavy volume of over 11 million shares traded.

99.    Kornit Digital's financial results and business performance have continued to deteriorate.  For example, on February 15, 2023, Kornit Digital reported deeply disappointing results for its fourth quarter and full year ended December 31, 2022.  Among other troubling disclosures, Kornit Digital revealed that it had generated only $63.3 million in fourth quarter revenue, a 28% decline from the comparable period the prior year.  In addition, Kornit Digital stated that it had suffered a $35.4 million loss during the quarter, compared to net income of $1 million during the comparable prior year period.  The price of Kornit Digital stock fell to less than $22 per share following this news, an 85% decline from the price at

which Kornit Digital shares were sold in the November 2021 Offering and a nearly

83% decline from the price at which defendant Samuel had sold his own Kornit

Digital shares during the Class Period.

100.   As a result of defendants' wrongful acts and omissions, and the

precipitous decline in the market value of Kornit Digital common stock, plaintiff and

other Class members have suffered significant financial losses and economic

damages under the federal securities laws.

## ADDITIONAL SCIENTER ALLEGATIONS

101.   As alleged herein, defendants acted with scienter in that defendants

knew, or recklessly disregarded, that the public documents and statements they

issued and disseminated during the Class Period to the investing public in the name

of the Company, or in their own name, were materially false and misleading.

Defendants knowingly and substantially participated or acquiesced in the issuance

or dissemination of such statements and documents as primary violations of the

federal securities laws.   Defendants, by virtue of their receipt of information

reflecting the true facts regarding Kornit Digital, and their control over and/or receipt

and/or modification of Kornit Digital's allegedly materially misleading

misstatements, were active and culpable participants in the fraudulent scheme

alleged herein.

102.  Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

103.  The Individual Defendants, because of their positions with Kornit Digital, controlled the contents of Kornit Digital's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of the defendants is responsible for the accuracy of Kornit Digital's corporate statements and is, therefore, responsible, and liable for the representations contained therein.

104.  The scienter of defendants is further underscored by the certifications mandated by the Sarbanes-Oxley Act of 2002 of defendants Samuel and Rozner filed

during the Class Period, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Kornit Digital was made known to them and that the Company's disclosure-related controls were operating effectively.

105.   In addition, Kornit Digital insiders sold ***nearly $12 million*** worth of Kornit Digital stock during the Class Period at fraud-inflated prices.  These sales were highly suspicious in both timing and amount.  For example, defendant Samuel alone sold $8.4 million worth of Kornit Digital shares in August 2021, when the stock was trading near all-time highs and five times higher than it was trading at the end of the Class Period, and nearly $1 million in February 2022 before the truth was revealed.  Notably, the number of shares sold by defendant Samuel in August 2021 was almost five times greater than his entire share sales in the 24-month period prior to the Class Period.

106.   Further, in November 2021, the Company and a favored shareholder collectively sold close to three million Kornit Digital ordinary shares at $151 per share generating gross proceeds of over $450 million.[1]   The stock sold in the

---

[1]     Kornit Digital sold approximately 2.3 million shares in the Offering, while approximately 700,000 shares were sold in the offering by Amazon.com NV Investment Holdings LLC, pursuant to the exercise of a warrant granted to Amazon by the Company.

Offering was at a price over six times higher than the stock price at the end of the Class Period, further bolstering an inference of scienter.

## LOSS CAUSATION

107.  During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Kornit Digital common stock and operated as a fraud or deceit on Class Period purchasers of Kornit Digital common stock by failing to disclose and misrepresenting the adverse facts detailed herein.   When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Kornit Digital common stock declined significantly as the prior artificial inflation came out of the stock's price.

108.  As a result of their purchases of Kornit Digital common stock during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.   Defendants' false and misleading statements had the intended effect and caused Kornit Digital common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $181.38 per share on November 19, 2021.

109.  By concealing from investors the adverse facts detailed herein, defendants presented a misleading picture of Kornit Digital's business, risks, and future financial prospects.   When the truth about the Company was revealed to the

market, the price of Kornit Digital common stock fell significantly, dropping to a low of just $20 per share by July 6, 2022, removing the inflation therefrom and causing economic loss to investors who had purchased Kornit Digital common stock during the Class Period.

110.    The decline in the price of Kornit Digital common stock after the corrective disclosures came to light was a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in Kornit Digital common stock negates any inference that the losses suffered by plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.

111.    The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of Kornit Digital common stock and the subsequent significant declines in the value of Kornit Digital common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

112.    At all relevant times, the market for Kornit Digital common stock was an efficient market for the following reasons, among others:

(a)     Kornit Digital common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, national stock market;

(b)     as a regulated issuer, Kornit Digital filed periodic public reports with the SEC;

(c)     Kornit Digital regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Kornit Digital was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

113.   As a result of the foregoing, the market for Kornit Digital common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Kornit Digital common stock during the Class Period suffered similar injury through their purchases of Kornit Digital common stock at artificially inflated prices and a presumption of reliance applies.

114.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on defendants' material misstatements and/or omissions.  Because this action involves defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

115.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint.   Many of the specific statements pled herein were not identified as "forward-looking statements" when made.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein,

defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Kornit Digital who knew that those statements were false when made.

### COUNT IV

**For Violation of §10(b) of the 1934 Act and
Rule 10b-5 Promulgated Thereunder
Against Kornit Digital and the Officer Defendants**

116.   Plaintiff incorporates ¶¶1-39 and 67-115 by reference.

117.   This Count is brought pursuant to §10(b) of the 1934 Act, 15 U.S.C. §§78j(b), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, on behalf of the Class, against Kornit Digital and the Officer Defendants.

118.   During the Class Period, Kornit Digital and the Officer Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

119.   Kornit Digital and the Officer Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Kornit Digital common stock during the Class Period.

120.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Kornit Digital common stock.  Plaintiff and the Class would not have purchased Kornit Digital common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

121.   As a direct and proximate result of Kornit Digital and the Officer Defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Kornit Digital common stock during the Class Period.

## COUNT V

### For Violation of §20(a) of the 1934 Act
### Against Kornit Digital and the Officer Defendants

122.   Plaintiff incorporates ¶¶1-39 and 67-121 by reference.

123.   The Officer Defendants acted as controlling persons of Kornit Digital within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Kornit Digital stock, the Officer Defendants had the power and authority to cause Kornit Digital to engage in the wrongful conduct complained of herein.  Kornit Digital controlled the Officer Defendants and all of its employees.  By reason of such conduct, Kornit Digital and the Officer Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Designating plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  February 17, 2023        SEEGER WEISS LLP
                                 CHRISTOPHER A. SEEGER


                                 /s/ Christopher A. Seeger
                                 CHRISTOPHER A. SEEGER

                                 55 Challenger Road, 6th Floor
                                 Ridgefield Park, NJ  07660
                                 Telephone: (973) 639-9100
                                 Facsimile: (973) 679-8656
                                 cseeger@seegerweiss.com

                                 ROBBINS GELLER RUDMAN
                                   & DOWD LLP
                                 SAMUEL H. RUDMAN
                                 VICKI MULTER DIAMOND
                                 58 South Service Road, Suite 200
                                 Melville, NY  11747
                                 Telephone:  631/367-7100
                                 631/367-1173 (fax)
                                 srudman@rgrdlaw.com
                                 vdiamond@rgrdlaw.com

ROBBINS GELLER RUDMAN
 & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com

Attorneys for Plaintiff